**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMUNITY SERVICES, INC.,** | : | **CIVIL ACTION NO. 1:06-CV-1206** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **HEIDELBURG TOWNSHIP, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This controversy lies at the intersection of local land use law and the Fair

Housing Act ("FHA"), 42 U.S.C. §§ 3601–3631.  The instant action was commenced

by Community Services, Inc. ("CGS"),[1] on behalf of eight mentally disabled

individuals who currently reside at a closed state hospital.  CSG contends that

defendants Heidelburg Township ("Township"), Heidelberg Township Board of

Supervisors ("Township Supervisors"), and Heidelberg Township Zoning Hearing

Board ("Zoning Board"), intentionally interpreted a zoning ordinance to prevent,

and refused to grant, a reasonable accommodation to permit, these individuals from

moving into a home within the Township, in violation of the FHA.  CSG requests

that the court preliminarily enjoin the defendants from further impeding a move

onto the property.  After a carful review of the record, and following argument by

counsel for the parties, the court will grant CSG's request.

---

[1] The entity is registered with the Commonwealth as Community Services
Group, Inc.  (See Doc. 7 at 97.)

I.   **Findings of Fact**[2]

1.   CSG is a regional healthcare provider for individuals challenged with mental

retardation and mental health issues, and provides supervised care,

maintenance, and training for these individuals in residential programs, day

programs and employment services, and in residential living facilities.  (Doc.

7 at 4, 23.)

2.   For over 30 years, CSG has provided community-based mental health

services to counties in compliance with the Mental Health/Mental

Retardation Act of 1966, 50 PA. STAT. ANN. §§ 4101–4704.  (Doc. 7 at 23.)

3.   On February 17, 2006, CSG entered into an agreement for the purchase of

real property located at 1862 Smith Station Road, Spring Grove,

Pennsylvania ("Township Property"), with the intent to use the property as a

"Long Term Structured Residence" ("LTSR") for eight mentally ill

individuals.  (Doc. 7 at 86, 101, 105, 110-11.)

4.   Under Pennsylvania law, a LTSR is defined as a "highly structured

therapeutic residential mental health treatment facility for adults."  55 PA.

CODE § 5320.3.

---

[2]  Defendants lodge objections to the inclusion of certain documents in the
administrative record, claiming that they were not before the defendants.  These
objections are without merit, as the documents in question were either considered
by the Zoning Hearing Board or the Township Board of Supervisors, or are matters
of public record.  Moreover, the exclusion of these documents from the
administrative record would not affect the court's *ratio decidendi*.

5.  Under Pennsylvania law, to be eligible for admission to a LTSR, a prospective resident must, *inter alia*, be eighteen years of age or older and "[e]vidence a severe psychological disability as a result of serious mental illness that indicates a less restrictive level of care as inappropriate." 55 PA. CODE § 5320.31.

6.  In March 2006, CSG filed a form application with the Township, seeking a special exception for the agriculturally-zoned Township Property. (Doc. 7 at 1-21; see also Doc. 1 ¶¶ 41-45.)

7.  The application describes the current use of the Township Property as a ranch single-family residential home, with on-site well and sewage, and a narrative appended to the application describes the proposed use as a "supervised protective living arrangement for 8 people who will be living together as a functional family." (Doc. 7 at 1-2, 4, 86.)

8.  The narrative states that the existing attached garage will be converted to adequately house the eight residents, that "[i]t is not anticipated that the current building envelope (together with the garage) will be expanded," and that the use will be limited to the first floor and the basement." (Doc. 7 at 4.)

9.  The narrative states that the prospective residents will all be eighteen years of age or older, that they will be supervised by staff twenty-four hours a day, and that the property's driveway will provide sufficient off-street parking. (Doc. 7 at 4.)

10.   The narrative states that "there will be no measurable impact on local public services . . . . There is on-site sewer and water, and none of the residents will drive, nor need services from the local public school system . . . . [and] with the 24-hour supervision, there is no need for public support."  (Doc. 7 at 5.)

11.   The narrative asserts that the property's intended use falls within the Township Zoning Ordinance's definition of "family," and as such is permitted as of right.  (Doc. 7 at 4.)

12.   The Township Zoning Ordinances defines "Family" as:

> One (1) or more persons who live in one (1) dwelling unit and maintain a common household.  May consist of a single person or two (2) or more persons, whether or not related by blood, marriage or adoption. May also include domestic servants and gratuitous guests, but not occupants of a club, fraternal lodging, or rooming house.

(Doc. 7 at 302.)

13.   The narrative states that CSG was advised by the Township Zoning Officer that its proposed use constitutes a "Domiciliary Care Unit" ("DCU"), and the narrative requests a special exception.  (Doc. 7 at 4.)

14.   The Township Zoning Ordinance defines a DCU as:

> An existing building or structure designed and occupied as living quarters for one (1) family which provides twenty-four (24)-hour supervised protective living arrangements for not more than two (2) unrelated persons 18 years of age and above who are disabled physically, mentally, emotionally or as a result of old age.

(Doc. 7 at 302.)

15.   The Township Property is zoned "Agricultural" which permits single family dwellings as of right and DCUs by special exception.  (Doc. 7 at 320.)

16.     There are no zoning classifications in the Township Zoning Ordinance in
        which a DCU is a permitted use as of right.  (Doc. 7 at 314-321.)

17.     On March 27, 2006, CSG sent additional correspondence to the Zoning
        Board, reiterating CSG's position that its proposed use fit the definition of
        "family" for purposes of a single-family dwelling as used in the Township's
        Zoning Ordinance, and, in the alternative, requesting the "family"
        classification as a reasonable accommodation under the FHA.  (Doc. 7 at 24.)

18.     CSG also sought to amend its zoning application to reflect a request for a
        variance, explaining that "[s]hould the [Zoning Board] determine the
        proposed use is a Domiciliary Care Facility as opposed to a family unit, the
        variance is needed because . . . [a] Domiciliary Care Unit is limited to 'not
        more than two unrelated persons.'" (Doc. 7 at 22.)

19.     CSG included in its correspondence to the Zoning Board information
        pertaining to the Americans with Disabilities Act, to wit, United States
        Supreme Court case law and an Executive Order of the President dated
        June 18, 2001.  (Doc. 7 at 25-39.)

20.     On March 28, 2006, the Zoning Board held a hearing on CSG's zoning
        application.  (Doc. 7 at 90.)

21.     Ms. Susan Blue ("Blue"), the president of CSG, testified at the hearing that
        CSG currently has 300 group homes in 19 counties, and that it currently
        operates one other LTSR in State College, Pennsylvania.  (Doc. 7 at 100, 110-
        11, 177.)

22.   Blue testified that eight individuals—two women and six men—are waiting to move into the Township Property.  (Doc. 7 at 139.)

23.   Blue testified that the LTSR program is for people with mental health difficulties, not for people coming out of the criminal justice system, and that individuals residing at a LTSR are typically regaining skills that they once had but have lost because of mental illness or other difficulties.  (Doc. 7 at 111-14.)

24.   She stated that individuals living in a LTSR function as a family, partaking in family events such as celebrating holidays and planning vacations together, and that staff emphasize every day living skills in preparation for a transition to a less restrictive environment.  (Doc. 7 at 111-14.)

25.   Blue testified that a psychiatrist, masters-level staff, and county officials assess LTSR individuals at the home on a regular basis, and that recovery goals are set for the individuals to transition them to less structured, independent living, which may occur in as little as six months or as long as three years.  (Doc. 7 at 111-12.)

26.   Mr. Will Short ("Short"), the realtor who located the property for CSG, testified that the home consists of 3,468 square feet, and a 900 square foot garage, and estimated that eight vehicles could park on the driveway as it now exists.  (Doc. 7 at 108-09, 126.)

27.   Short testified that eight people currently reside at the property, that the septic system was certified as functional for the current level of use, and that

6

CSG was prepared to address any necessary enhancement of capacity in light of expected demands.  (Doc. 7 at 109.)

28.  Ms. Melissa Jones ("Jones"), an employee of CSG, also testified at the March 28, 2006 Zoning Board hearing, and relayed that, in State College, CSG is currently operating a LTSR under the same regulations proposed for the Township Property.  (Doc. 7 at 102, 107, 177.)

29.  Jones testified that the Township Property is ideal because the house is large enough to accommodate the prospective residents and staff, the agricultural setting would provide a relaxed environment for the residents, and shopping and physician's services are in close proximity.  (Doc. 7 at 102, 110.)

30.  She stated that CSG planned to pave the driveway at the Township Property and perform interior renovations to convert the garage into two bedrooms (so that the property will have four single bedrooms, and two double bedrooms), but that neither the work nor the property's intended use would impact on the neighborhood.  (Doc. 7 at 102, 108.)

31.  Jones relayed that, since January 2006, CSG employees have been providing services to and working with the eight prospective residents of the Township Property, who would function as a family at the LTSR and share household responsibilities such as budgeting, grocery shopping, menu and meal preparation, and planning trips and shopping in general with the assistance of staff.  (Doc. 7 at 103.)

32.    Jones testified that the eight individuals are in their mid 40s to early 50s, currently reside at the Harrisburg State Hospital, and have been evaluated and qualified to live in a community with the aid of 24-hour staff to help them through everyday living skills, and to prepare them for independent living. (Doc. 7 at 105, 108.)

33.    Jones stated that the prospective residents will be living in the Township Property on a long-term basis, and that it will be staffed 24-hours a day. (Doc. 7 at 127.)

34.    Jones testified that a psychiatrist will be at the house for several hours every week to work with the residents, and that CSG staff will monitor any medications or mental health challenges that the residents might face, and help them to develop skills necessary for transition to independent living. (Doc. 7 at 104, 129.)

35.    She stated that, on average, three or four staff people will be at the Township Property, that the maximum number of staff on site will be six, and that the property has more than ample off-street parking to accommodate the residents, staff, and visitors.  (Doc. 7 at 123-24, 129.)

36.    According to Jones, the staff will include a program director or assistant program director, a nurse, and one or two advisors, all of whom will have state regulated mental health experience, and none of whom will sleep at the Township Property.  (Doc. 7 at 127-28.)

37.   Jones testified that the program director is a master's-level candidate, and that a qualified mental health professional is on staff 40 hours per week, and also functions as an advisor.  (Doc. 7 at 128-29.)

38.   Jones testified that any risk to the community would be minimal, that the prospective residents will be monitored by staff and on medication and treatment programs, that the house will be locked at all times, and that staff must approve any resident's leaving of the premises, such as going to work, to a vocational service, or shopping.  (Doc. 7 at 106, 115-16, 129.)

39.   Mr. Steve Warren ("Warren") also testified at the March 28, 2006 Zoning Board hearing.  (Doc. 7 at 116.)

40.   Warren stated that he has served for the past twenty-two years as the county administrator for the York/Adams Mental Health/Mental Retardation Program, which is responsible for providing community-based services for individuals with mental disabilities.  (Doc. 7 at 116.)

41.   Warren testified that the county does not offer these mental health services directly, but contracts with providers such as CSG.  (Doc. 7 at 117.)

42.   He stated that since January 2005, when the Governor of Pennsylvania announced the closing of the Harrisburg State Hospital, Warren and his staff have worked to assess which of the 120 individuals at the hospital could return to the community.  (Doc. 7 at 117-18.)

43.   Warren and his staff did an in-depth assessment of the individuals at the hospital, identified their specific program needs and sent out requests for

proposals to identify agencies that could provide these needs, and selected CSG to provide the services for the eight prospective residents of the Township Property.  (Doc. 7 at 125.)

44.   Warren testified that CSG was highly recommended by the State Office of Mental Health to implement the LTSR program for these prospective residents.  (Doc. 7 at 120.)

45.   Warren stated that each prospective resident received a comprehensive clinical assessment to determine what level of skills he or she had developed and whether he or she would be able to function and benefit from the LTSR; he also confirmed that each prospective resident has been diagnosed and is being treated for a mental illness.  (Doc. 7 at 120, 121-22, 133.)

46.   Warren testified that the Harrisburg State Hospital officially closed on January 27, 2006, that the eight prospective residents are among the last remaining residents of the institution eligible for community placement, and that, pending such placement, the county has been leasing space in the closed hospital for these individuals.  (Doc. 7 at 120, 122-23.)

47.   Warren testified that the Township Property will be licensed for and limited to eight LTSR residents.  (Doc. 7 at 134.)

48.   Several Township residents spoke at the March 28, 2006 Zoning Board hearing, inquiring whether any of the prospective residents were "child molesters, fire bugs, or drug addicts," or likely to go "on a rampage."  (Doc. 7 at 131, 137.)

10

49. Blue responded that each prospective resident has been assessed to verify that they are not a danger to others, that the State College LTSR has not had any problems with violence, and that staff is trained in de-escalation techniques should a problem arise.  (Doc. 7 at 131, 138).

50. Blue also relayed that the house will have an alarm system and that the staff will be required to confirm visually the presence of each resident every thirty minutes, twenty-four hours a day.  (Doc. 7 at 136-37.)

51. Following testimony and comments by the audience, the solicitor for the Zoning Board argued that the proposed use for the Township Property was not a "family" residence, but more akin to a DCU or a convalescent home, either of which would require a variance.  (Doc. 7 at 92-93, 145-46.)

52. The Zoning Ordinance defines "convalescent home" as: "Any structure containing sleeping rooms where persons are housed or lodged and furnished with meals and nursing care."  (Doc. 7 at 302.)

53. There are no zoning classifications in the Township Zoning Ordinance in which a convalescent home is a permitted use as of right.  (Doc. 7 at 314-321.)

54. Following a fifteen minute caucus the Zoning Board determined that CSG's proposed use for the Township Property did not fall within the definition "family" as that term is used in the Township Zoning Ordinance.  (Doc. 7 at 148-49.)

55.   CSG then requested that the ZHB consider its proposed use a "family," as that term is used in the Township Zoning Ordinance, as a reasonable accommodation.  (Doc. 7 at 149.)

56.   The solicitor for the Zoning Board stated that he was not familiar with the law governing reasonable accommodations, that CSG's zoning application sought a special exception and not a variance, that the Zoning Hearing was not noticed for a variance, and that the Zoning Board would like to give the Township residents additional time to place on the record any concerns with CSG's proposed use.  (Doc. 7 at 150-54.)

57.   Township residents again spoke up, expressing concern for the safety of the community and expressing consternation about plaintiff's unwillingness to disclose the precise nature of the prospective residents' mental illnesses. (Doc. 7 at 155, 158, 159).

58.   Township residents relayed feelings that those with "self-inflicted" disabilities should not be permitted to live in the community.  (Doc. 7 at 156.)

59.   Township residents relayed concerns that the prospective residents may not be able to swim and could be injured in one of the ponds in the community. (Doc. 7 at 159.)

60.   Following the Township residents' voicing of their concerns, the Zoning Board declined to address the issue of whether to deem CSG's proposed use a "family" as a reasonable accommodation, and recessed the hearing until April 25, 2006.  (Doc. 7 at 160.)

61.  On April 18, 2006, CSG sent to the solicitor for the Zoning Board a memorandum of law in support of its application, which discusses the Township Property, the role of the individuals who will reside therein, the Fair Housing Act and issues of intentional discrimination, disparate impact, and refusal to make a reasonable accommodation, and enclosed case law from the Third Circuit and Pennsylvania Supreme and Commonwealth Courts.  (Doc. 7 at 40-83.)

62.  CSG continued to correspond with the solicitor for the Zoning Board, and on April 21, 2006 forwarded to the solicitor additional case law on the Fair Housing Act.  (Doc. 7 at 84-85.)  7 at 84.)

63.  On April 25, 2006 the Zoning Board continued the hearing on CSG's zoning application, noticing the meeting for "a variance from the requirements of the [Township's] Zoning Ordinance to permit a group of unrelated individuals with disabilities to reside in a supervised living arrangement with medical care and treatment as a 'reasonable accommodation' under the Fair Housing Act."  (Doc. 7 at 164, 166-67. )

64.  Present at the hearing were the solicitor for the Zoning Board, the solicitor for the Board of Supervisors, counsel for four Township residents, and various other residents.  (Doc. 7 at 164, 166, 187, 193.)

65.  Ms. Lorie Freeman ("Freeman"), the individual contracting to sell the Township Property to CSG, testified on behalf of CSG.  (Doc. 7 at 176.)

66.  Freeman testified that the house is situated on two and a quarter acres of
     farmland, has six bedrooms, a large kitchen, dining and family room area,
     and that the facilities and septic system easily accommodated ten to fourteen
     residents.  (Doc. 7 at 180-84.)

67.  She stated that the property's off-street parking was sufficient to
     accommodate her family's six cars, two flatbed trailers, box trailer, and
     camper.  (Doc. 7 at 183.)

68.  Township residents represented by counsel testified that they were
     concerned about the traffic of "different people, different residents, different
     staff, different workers" that would be "coming and going," and that CSG
     should instead place the prospective residents in an area that is "zoned for
     that type of people."  (Doc. 7 at 197, 203, 206.)

69.  The Zoning Board stated that anyone attending the hearing who wanted to
     voice their concerns should approach counsel for the four residents and
     request to be called as a witness; the Zoning Board subsequently asked all
     Township residents who wanted to speak to stand and to take a collective
     oath.  (Doc. 7 at 216-217, 219.)

70.  Township residents voiced concerns about liability, should one of the
     prospective residents become injured or drown in one of the ponds in the
     community.  (Doc. 7 at 230-31.)

71.  Township residences voiced concerns over "what type of handicapped
     people" CSG would bring to the property.  (Doc. 7 at 212.)

14

72.   Township residents requested the precise nature of the prospective resident's disabilities, and expressed concerns that the Township Property would become a "halfway house."  (Doc. 7 at 223-24, 232, 239.)

73.   Township residents expressed concerns that the prospective residents could go "wild" or "berserk."  (Doc. 7 at 230.)

74.   Township residents expressed concern their children would not be safe, and could wind up "dead along the side of the road."  (Doc. 7 at 223-26, 232, 236, 239.)

75.   Township residents expressed concerns that the prospective residents could be arsonists, rapists, murderers, or child molesters, and inquired whether bars would be placed on the windows of the home.  (Doc. 7 at 234-36.)

76.   Township residents expressed concerns that the community was very residential, that it did not have sufficient law enforcement, and that the residents would have to "get on guard, go buy guns, get big—great big dogs" to protect themselves.  (Doc. 7 at 235.)

77.   Township residents asked the Zoning Board for a referendum to vote on the matter, or for a stay of the application proceedings so that they could file a petition with their local legislators.  (Doc. 7 at 236-37.)

78.   Counsel for four Township residents accused CSG of hiding behind the Health Insurance Portability and Accountability Act (HIPAA) to avoid disclose of the nature of the prospective residents' mental illnesses.  (Doc. 7 at 249.)

79.     In an effort to address those concerns raised by the Township residents, CSG

        voluntarily proposed the following conditions:

     a.     At no time will the house be used by more than eight residents dwelling together.

     b.     CSG will install an alarm on a door which will immediately alert the staff if a resident leaves without permission.

     c.     CSG will maintain a policy that no resident will leave without prior approval by the staff.

     d.     No person will reside in the dwelling without prior approval by a professional team that the person is able to live in a community setting.

     e.     No person will be approved for the residence who has a prior criminal conviction as a child molester or arsonist.

     f.     The staff will contact the local police department, fire department, and/or emergency ambulance in the event of a situation that requires the services of these agencies.

     g.     CFG will install an alarm light.

        (Doc. 7 at 221, 227, 259.)

80.     At the close of the April 25, 2006 hearing, the Zoning Board voted 3-0 to reject

        CSG's application for a variance.  (Doc. 7 at 261.)

81.     The solicitor for the Zoning Board submitted to CSG a five-paged letter,

        dated April 25, 2006, outlining the board's findings.  (Doc. 7 at 264-69.)

82.     The letter states that the Zoning Board determined that the individuals'

        residence at the home would be incidental to the treatment and training they

        would receive, and that the principal use would not be as a "family" dwelling.

        (Doc. 7 at 265.)

83.     The letter states that CSG's proposed use may "have been perfectly suited"

        for a DCU classification, but that CSG failed to seek an exception for that

        classification's numerical limitation and, in any event, CSG failed to "present

        specific evidence" of the proposed residents' disabilities.  (Doc. 7 at 267.)

84.     The letter states that CSG's proposed use "falls within or is similar to" a

        convalescent home, but that CSG "failed to present evidence or to persuade"

        the Zoning Board that requiring a special exception for this use was

        discriminatory.  (Doc. 7 at 267.)

85.     The letter states that CSG witnesses "refused to testify as to any of the facts

        underlying" the prospective residents' disabilities, and that "[t]hose who

        opposed [CSG's zoning] application could not even make independent

        inquiry because the identity of the [prospective] residents was not revealed."

        (Doc. 7 at 266.)

86.     The letter avers that "[w]ithout knowing the specific disabilities [of the

        individuals], the Board has no way of determining whether or not they can

        otherwise obtain housing on a par with that of those who are not disabled. . . .

        [and] cannot tell whether [other options] would have been suitable to the

        needs of [the prospective residents] because [CSG] did not present specific

        evidence of their disabilities or the needs that arise as a result of those

        disabilities."  (Doc. 7 at 266-67.)

87.     The letter provides that "[i]t may well be that [CSG] find[s] HIPAA to be

        problematic . . . but [CSG] had the burden of presenting evidence and the

Board is entitled to draw negative inferences from [CSG's] failure or inability to present specific evidence" of the disabilities.  (Doc. 7 at 266.)

88.   The April 25, 2006 letter concludes that the Zoning Board "has DENIED [CSG's] challenge to the determination of the zoning officer that the principal use of the proposed facility is not that of a single family dwelling, and the Board has DENIED [CSG's] request for a variance to permit the proposed use as a reasonable accommodation under the Fair Housing Act."  (Doc. 7 at 268.)

89.   On May 2, 2006 CSG sent correspondence to the solicitor for the Township Supervisors, setting forth the facts and circumstances surrounding CSG's proposed use of the Township Property, advising the Township Board of its obligations under the Americans with Disabilities Act ("ADA") and the FHA, that the Zoning Board interpreted the Township's Zoning ordinances in a discriminatory manner, that requiring CSG to disclose the prospective residents' medical records before granting a variance likely violated the ADA, the FHA, and HIPAA, and again requesting that, as a reasonable accommodation, the Township Supervisors and/or Zoning Board interpret the ordinance governing "family" dwellings to include CSG's proposed use, and issue to CSG a use and occupancy certificate.  (Doc. 7 at 283-86.)

90.   The correspondence also noted that CSG would address the request for a reasonable accommodation at the Township Supervisor's meeting the following evening.  (Doc. 7 at 283-86.)

18

91.    Minutes from the May 3, 2006 Township Supervisors' meeting reflect that

CSG asked the Board to grant to CSG a "reasonable accommodation"under

the FHA to allow eight individuals with disabilities to reside at the Township

Property.  (Doc. 7 at 292.)

92.    The Minutes reflect that CSG informed the Board that the Township

Property is a single-family dwelling on over two acres of land, that it consists

of six bedrooms and 3,500 square feet of living area, and that has ample

parking and no current sewer problems.  (Doc. 7 at 292.)

93.    The Minutes reflect that CSG advised Township Supervisors that the

prospective residents have disabilities that impair major life activities, that

they would live together as a family unit, maintain a common household, and

share household routines and chores, that the home will be staffed twenty-

four hours a day, and that both the zoning decision and the Township's

ordinance likely violate the FHA.  (Doc. 7 at 292.)

94.    The Minutes reflect that the Township Supervisors refused to respond to

CSG's request because they had insufficient time to review all of the

pertinent information.  (Doc. 7 at 292.)

95.    On May 11, 2006, CSG wrote to the solicitor for the Township Supervisors,

reiterating that CSG cannot disclose the medical records of the prospective

residents, enclosing a memorandum from Dr. Brian Condron, MD, on mental

illness, and reminding the solicitor that, per the Township's Zoning

Ordinances, action on CSG's May 2, 2006 written request for a use certificate must be taken within fifteen days of the request.  (Doc. 7 at 287-88.)

96.     The following day, May 12, 2006, the solicitor for the Township Board  wrote to CSG advising that the ordinance requiring action within fifteen days of a request for a use certificate was "not applicable" to CSG because the Zoning Board had already ruled on CSG's zoning application, that it was in CSG's "best interest" to "allow the [Township Supervisors] to consider [the] request," and that the Township Board "would not typically be the appropriate party pursuant to the terms of the Zoning Ordinance to consider" the relief requested by CSG.  (Doc. 7 at 290.)

97.     On May 26, 2006, the Zoning Board's notice of decision was issued, consisting of thirty-one findings of fact and twelve conclusions of law, appending the April 25, 2006 letter from the solicitor for the Zoning Board to CSG.  (Doc. 7 at 275-82.)

98.     The decision states that the Zoning Board upheld the Zoning Officer's determination that CSG's proposed use for the Township Property does not fit the definition of "single-family dwelling," and denied CSG's request for a variance.  (Doc. 7 at 269, 274.)

99.     The decision states that CSG's proposed use is that of a "health care treatment facility," a term that is not defined in the Township zoning ordinance, and an entity which cannot operate as of right in any of the Township zones.  (Doc. 7 at 271.)

20

100.   The decision states that the prospective residents of the Township Property
       "could be receiving regular and on-going medication and some could be
       undergoing treatment for addiction to alcohol or illegal drugs . . . . [and]
       Township officials would have no way of knowing this."  (Doc. 7 at 277.)

101.   The decision states that "[t]he Board cannot determine whether the
       [prospective residents] who would reside at the facility are disabled . . .
       because [CSG] did not present evidence as to the identity or the medical
       conditions of any of the proposed residents."  (Doc. 7 at 277.)

102.   The decision states that CSG "did not present any evidence to show that
       location in an Agricultural zoning district would be a vital component of the
       treatment of the residents of the proposed facility," and that the "Township
       zoning ordinance does not provide for a grant of a variance as a 'reasonable
       accommodation' under the Fair Housing Act."  (Doc. 7 at 278.)

103.   The decision states that CSG "failed to present evidence that the structure
       located at [the Township Property] cannot be used for a purpose that is
       permitted in an Agricultural zoning district," that it "failed to present
       evidence to show that it suffers from an unnecessary hardship that is unique
       to this property due to its physical circumstances," and that it "failed to
       present evidence to show that the requested relief represents the minimum
       variance that would afford relief."  (Doc. 7 at 279.)

104.   On June 14, 2006, CSG commenced the instant action against the Township,
       Supervisors, and Zoning Board, averring claims of intentional discrimination

and refusal to grant a reasonable accommodation in violation of the FHA. (Doc. 1.)

105.   On June 21, 2006, CSG filed a motion for preliminary injunctive relief, requesting that the court enjoin defendants from interpreting and applying zoning ordinances in a manner that prohibits the prospective residents from moving into the Township Property, and direct the defendants to grant to CSG the necessary permits to commence renovations to the home.  (Doc. 4.)

106.   On June 23, 2006, CSG filed with the court the declaration of Brian Condron, M.D. ("Dr. Condron"), a psychiatrist, who provided the opinions contained therein to a reasonable degree of professional certainty.  (Doc. 10.)

107.   The declaration states that Dr. Condron has been providing mental health treatment and services to the eight prospective residents of the Township Property.  (Doc. 10 ¶¶ 1, 2.)

108.   The declaration states that each of the prospective residents has been diagnosed with and suffers from mental illness, and is currently housed at the Harrisburg State Hospital, which was officially closed as of January 27, 2006.  (Doc. 10 ¶¶ 3-4.)

109.   The declaration states that the prospective residents were approved for placement in a community-based home within a LTSR, but remain at the closed Harrisburg State Hospital.  (Doc. 10 ¶¶ 5-6.)

110.   The declaration provides that the state hospital is a large structure, that living conditions are currently problematic for the prospective residents, that

extended living in this closed facility is counter-productive and harmful to

the prospective residents' mental health, and that, for clinical and

therapeutic reasons, these individuals should be moved to a community-

based placement where they may live together in a single-family home.

(Doc. 10 ¶¶ 9-11.)

111.  The declaration states that it is critical for the prospective residents to move

to a home as each day spent in the closed state hospital is "harmful" to their

"mental health and well-being."  (Doc. 10 ¶ 12.)

112.  Following a telephone conference with counsel, a hearing on plaintiff's

motion for preliminary injunctive relief was scheduled to commence on June

29, 2006; however, the court granted the parties' joint motion for a

continuance until July 20, 2006.  (See Docs. 19-22.)

113.  On June 29, 2006, plaintiff filed a motion to enter the preliminary injunction

against the Zoning Board as uncontested, for failure of the Zoning Board to

file a brief in opposition as is required by the local rules of court.  (See

Doc. 29.)

114.  Appended to the motion is a letter dated June 29, 2006, from the solicitor for

the Zoning Board, addressed to counsel for the parties in this case.  (Doc. 29,

Attach. 1.)

115.  The correspondence avers that the Zoning Board met in executive session

and determined that it will not defend the instant action, that it holds the

belief that this court does not have authority to review its denial of plaintiff's

23

zoning application and its refusal to grant a variance, and that it is aware that its failure to participate in this action could result in the granting of plaintiff's motion for preliminary injunctive relief.  (Doc. 29, Attach. 1.)

116.   On the afternoon of July 19, 2006, and less than twenty-four hours prior to the hearing on plaintiff's motion, counsel for the Zoning Board entered his appearance in this case.  (Doc. 32.)

117.   On July 20, 2006, the court commenced the hearing on plaintiff's motion for preliminary injunction and permitted counsel for the Zoning Board to take part in the hearing, reserving judgment on plaintiff's motion to enter a preliminary injunction against the Zoning Board as uncontested.  (Doc. 35 at 1-11.)

118.   At the hearing Ms. Julie Weaver ("Weaver"), a regional director for CSG, testified that she is responsible for the oversight of several residential facilities, and that she has daily contact with CSG staff providing services to the eight prospective residents of the Township Property.  (Doc. 35 at12-13.)

119.   Weaver stated that the Harrisburg State Hospital is currently closed, and that potential lessors periodically inspect the facility.  (Doc. 35 at 14-15.)

120.   She stated that the prospective residents are currently housed in an uncarpeted ward on the second floor of the hospital, where two of the floor's bedrooms have been converted to a staff office and dining area.  (Doc. 35 at 17-19, 22, 26.)

121.   Weaver testified that the residents currently have one bathroom facility with three stalls, to be shared by both male and female residents, and that the shower room is also the laundry room for the residents and the dryer is located on the first floor of the building.  (Doc. 35 at 20, 21.)

122.   According to Weaver, there are no dining facilities available at the state hospital, and the residents do not have a choice of the food which CSG purchases from a local nursing home.  (Doc. 35 at 19.)

123.   Weaver testified that CSG searched for a LTSR that was large enough for six bedrooms, a living room, family room, multiple bathrooms, and located in a rural area for a yard and areas for recreation.  (Doc. 35 at 32.)

124.   Weaver testified that she is familiar with the Township Property, which contains a large kitchen, multiple living areas, including a living room, family room, lounge area suitable for private family visits, and a porch and yard. (Doc. 35 at 22.)

125.   Weaver testified that the prospective residents are the only patients from York and Adams Counties who are eligible for community-based placement but remain in a institutional setting, and that they are excited to move into the Township Property; she also testified that the prospective residents have been frustrated to see others leave the state hospital, knowing that they too should be living in and becoming part of a community near their respective families.  (Doc. 35 at 13-14, 23, 46.)

126.   Weaver testified that the funding for this LTSR was initially approved

through June 30, 2006, and that CSG has had to rent storage units for the

linens, appliances, and furnishings that were purchased in anticipation of

moving into the Township Property.  (Doc. 35 at 23-24.)

127.   Weaver testified that CSG cannot apply for permits to undertake necessary

renovations to the Township Property until its use has been approved by the

defendants.  (Doc. 35 at 39-40.)

128.   Weaver testified that each of the prospective residents received an extensive

evaluation with a team of clinicians, county staff, and individuals from the

Pennsylvania Protection and Advocacy group, and that these individuals are

ready to move back into the community; Weaver further testified that, based

on her interaction with the prospective residents, they are experiencing a

continuing harm by virtue of their present living arrangement in a closed

state hospital, as they do not understand why a community does not want

them, and they are isolated from their family members, many of whom have

difficulty traveling to Harrisburg.  (Doc. 35 at 13-14, 41-42.)

129.   The court finds Ms. Weaver's testimony to be credible and cogent.

130.   Dr. Condron, a psychiatrist and medical director for CSG, also testified at the

July 20, 2006 hearing.  (Doc. 35 at 47.)

131.   Dr. Condron attended an undergraduate program at Villanova University

before earning his medical degree from Loyola University School of Medicine

in Chicago.  (Doc. 35 at 48.)

26

132.   He is board certified by the American Board of Psychiatry and Neurology, and a licensed psychologist in Pennsylvania, where he has been practicing psychiatry since 1973.  (Doc. 35 at 48.)

133.   Dr. Condron is qualified to testify as an expert in the field of psychiatry. (Doc. 35 at 49.)

134.   Dr. Condron testified that he has been the attending physician for the eight prospective residents since February of this year, that he sees each of them on a weekly basis, that he monitors their behaviors, their medications, side effects and efficacy, is responsible for their overall health, and is familiar with their medical conditions and their mental illnesses.  (Doc. 35 at 49, 56.)

135.   Dr. Condron testified that these individuals have been at the Harrisburg State Hospital from one year to twenty-five years, and that each received, in conjunction with the closure of the state hospital, a clinical review which determined that he or she no longer requires placement in a state hospital, and that each is certified for placement in a LTSR.  (Doc. 35 at 50, 54-55, 62, 66-67.)

136.   Dr. Condron testified that it is important that people with mental illness live in the least restrictive fashion in order to maintain their dignity and self respect, and that the current environment at the closed state hospital is antiquated, uncomfortable, and, in some ways, physically unsafe, and that it is difficult for these residents to maintain their dignity in the present setting. (Doc. 35 at 51-52, 64-65.)

137.  Dr. Condron stated, to a reasonable degree of medical certainty, that it is extremely urgent that the prospective residents of the Township Property be placed outside of hospital, that every day they are not in a least restrictive environment affects their therapy, and that their mental health would likely progress if the individuals were removed from hospital and placed at the Township Property.  (Doc. 35 at 52-53, 63.)

138.  The court credits the testimony of Dr. Condron.

139.  Warren, the county administrator for the York/Adams Mental Health Retardation and Drug and Alcohol Program ("MHMR program"), also testified at the July 20, 2006 hearing.  (Doc. 35 at 68.)

140.  Warren testified that the MHMR program is a department within county government, and was founded in the Pennsylvania Mental Health and Mental Retardation Act of 1966.  (Doc. 35 at 69.)

141.  Warren testified that it is public policy in Pennsylvania, to the extent possible, to treat individuals with mental disabilities in the community rather than in institutions, and that a LTSR is one example of treating a person with a mental disability in a mainstream, community-based setting.  (Doc. 35 at 69-71.)

142.  He stated that the eight prospective residents of the Township Property were subject to psychiatric and psychological evaluations and that, following meetings with treatment teams, family members, advocates, and county case management staff, and a thorough review of their current treatment,

decisions were made as to the appropriate level of care for each individual; Warren testified that these eight individuals were clinically evaluated and approved for the LTSR level of care.  (Doc. 35 at 71-72, 81.)

143.   Based upon his twenty-two years of experience, Warren testified that a "not in my back yard" mentality exists in many communities where houses are in close proximity to one another, fostering opposition and a hostile environment for those attempting to transition into the community; consequently, Warren testified that the rural setting of the Township Property is ideal for the LTSR, relatively isolated from impediments to assimilation into the community.  (Doc. 35 at 86.)

144.   Warren testified that there are plans for two house vehicles, that family and friends may visit the prospective residents at the home, and that physicians and other treatment staff will visit on a weekly basis.  (Doc. 35 at 92-93.)

145.   Warren testified that neither the county nor CSG has been able to move the prospective individuals to the Township Property because they have not received the necessary approvals from the Township, and that the funds allocated for this project through the Department of Welfare are available only until July 31, 2006.  (Doc. 35 at 73-79, 94.)

146.   The court finds the testimony of Mr. Warren to be credible and congent.

## II.   Discussion

Plaintiff contends that defendants intentionally interpreted a zoning ordinance to prevent, and refused to grant a reasonable accommodation to permit,

the eight disabled individuals from residing in a home in the Township, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3631.  The instant motion requests that the court enjoin defendants from interpreting and applying zoning ordinances in a manner that prohibits the prospective residents from moving onto the property, and direct defendants to grant the permits necessary to perform planned renovations.  The court has jurisdiction to review these claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a).

The requirements for preliminary injunctive relief are well settled.  The moving party must establish that (1) there is a reasonable probability of success on the merits of its claims, (2) irreparable injury will result without injunctive relief, (3) granting the injunction will avoid a comparably greater injury than denying it, and (4) the injunction is in the public interest.  See BP Chems., Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 263 (3d Cir. 2000); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994); Neo Gen Screening, Inc. v. TeleChem Int'l, Inc., 69 F. App'x 550, 554 (3d Cir. 2003); Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994).  While each factor need not be established beyond doubt, they must combine to show the immediate necessity of injunctive relief.  See Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir. 2002); see also Walgreen Co. v. Sara Creek Prop. Co., 966 F.2d 273, 275-79 (7th Cir. 1992) (Posner, J.); 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.3 (3d ed. 1998).

## A. <u>Probability of Success</u>

The Fair Housing Act was passed in 1968 in an effort to eliminate discrimination in real estate transactions based upon race, color, religion, sex, or national origin.  Twenty years later, Congress amended the act to extend these protections to individuals with disabilities.  <u>See</u> <u>Cmty. Serv., Inc. v. Wind Gap Mun. Auth.</u>, 421 F.3d 170, 176 (3d Cir. 2005); <u>see also</u> <u>Lakeside Resort Enter., LP v. Bd. of Supervisors</u>, No. 05-1163, 2006 WL 2021020, at *1 & n.2 (3d Cir. July 20, 2006).  The act now makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of (a) that person; or (b) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or (c) any person associated with that person."  42 U.S.C. § 3604(f)(2).  Importantly, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  The FHA also provides broad relief for its violation, including actual and punitive damages, and any "relief [that] the court deems appropriate, [including] permanent or temporary injunction[s], temporary restraining order[s] . . . [or] order[s] enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate."  42 U.S.C. § 3613(c)(1).

31

A plaintiff may bring a claim under the FHA for disparate impact, intentional discrimination, or refusal to make a "reasonable accommodation." See Wind Gap, 421 F.3d at 176. The latter two causes of action are presently at issue.

### 1.    **Intentional Discrimination**

To establish an intentional discrimination claim under the FHA, a plaintiff must demonstrate that a discriminatory purpose was a "motivating factor" behind the challenged action, or that a contested regulation facially discriminates on the basis of the plaintiff's protected trait. Wind Gap, 421 F.3d at 177-78 (quoting Cmty. Hous. Trust v. Dep't of Consumer & Reg. Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)). For the former, the purpose "need not be malicious or invidious," nor must a plaintiff demonstrate that it figured "solely, primarily, or even predominantly into the motivation." Id. at 177. Rather, the plaintiff must merely demonstrate that the protected characteristic "played a role in the defendant's decision to treat [the plaintiff] differently." Id.

In the present case, the court finds that plaintiff has a high probability of success on its intentional discrimination claim based upon discriminatory purpose. Transcripts from the hearing before the Zoning Board reflect significant community concern over the specific nature of the prospective residents' disabilities. The Board did not seek to allay the pervasive—and perverse—misconceptions, but fostered the acrimony, and requested that private

32

counsel assist.[3]  See Cmty. Hous. Trust, 257 F. Supp. 2d at 227 ("[E]ven where

individual members of government are found not to be biased themselves, plaintiffs

can demonstrate a violation of the FHA if they can show that discriminatory

governmental actions are taken in response to a significant community bias."); see

also United States v. Borough of Audobon, 797 F. Supp. 353, 361 (D.N.J. 1991), aff'd,

968 F.2d 14 (1992).  And, despite federal and state law prohibiting the disclosure of

confidential information, the Zoning Board denied the zoning application, in part,

because plaintiff would not disclose the exact nature of the residents' mental

illnesses.  See 45 C.F.R. § 164.502; see also 55 PA. CODE § 5320.26 ("Providers of

LTSR services shall be responsible for ensuring that confidentiality of individual

mental health records is maintained in accordance with [law].").  Finally, the

Zoning Board's refusal to define plaintiff's proposed use as a "family" is directly at

odds with precedential Pennsylvania case law construing the *same* zoning parlance

to include staffed housing for mentally challenged individuals.  See Human Serv.

Consultants, Inc. v. Zoning Hearing Bd. of Butler Twp., 587 A.2d 40, 42 (Pa.

Commw. Ct. 1991).  Accordingly, there is substantial evidence of record that the

---

[3]  (See Finding of Fact No. 69.)

proposed residents' disabilities was a "motivating factor" in the defendant's decision to deny plaintiff's zoning application.[4]

The court also finds that there is a strong likelihood that plaintiff can demonstrate intentional discrimination through defendant's application of facially discriminatory zoning ordinances.  The ordinances define a DCU as a residence "designed and occupied as living quarters for one (1) family which provides twenty-four (24)-hour supervised protective living arrangements for not more than two (2) unrelated persons 18 years of age and above *who are disabled physically, mentally, emotionally, or as a result of old age.*"  Similarly, a convalescent home is defined as "[a]ny structure containing sleeping rooms where persons are housed or lodged and furnished with meals *and nursing care.*"  Neither of these classifications are allowed as of right in any of the Township's zoning areas, and the language of these ordinance specifically targets disabled individuals.  See, e.g., Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1010 (3d Cir. 1995) ("Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities.  Indeed, no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care."); see

---

[4] Defendants belatedly argue that the proposed use does not constitute a "dwelling," averring that the proposed residents are "transients" and CSG's proposed use of a "*long-term* structured residence" is merely transient housing. This argument is meritless.  There is a plethora of evidence of record that the LTSR is intended and designed for the proposed residents to live in and return to over a significant period of time.  See Lakeside Resort, 2006 WL 2021020, at *2-5; see also 42 U.S.C. § 3602(b) (defining "dwelling").

also <u>Dr. Gertrude A. Barber Ctr., Inc. v. Peters Township</u>, 273 F. Supp. 2d 643, 655-57 (W.D. Pa. 2003) (finding an ordinance facially discriminatory where it limits the number of unrelated persons who may live together); <u>Horizon House Dev. Serv., Inc. v. Twp. of Upper Darby</u>, 804 F. Supp. 683, 694 (E.D. Pa. 1992) (finding an ordinance facially discriminatory where it singles out for disparate treatment those individuals unable to live independently), <u>aff'd</u>, 995 F.2d 217 (3d Cir. 1993).  Other than ample evidence of discriminatory animus, the record is completely devoid of *any* reason for singling out and treating differently facilities for those with disabilities.  <u>See</u> <u>Wind Gap</u>, 421 F.3d at 180; <u>see also</u> <u>id.</u> at 178 ("[A] regulation or policy cannot use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination.").

The FHA was drafted specifically to combat ordinances such as the ones at issue.[5]  Accordingly, plaintiff is almost certain to demonstrate that these classifications serve as a "proxy" for those that are unable to care for themselves, and hence violate the FHA.[6]  See id. at 177-78.

### 2.    Failure to Make a Reasonable Accomodation

The FHA also requires that local land use boards make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped individuals] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B); Lapid-Laurel,

---

[5]  See H.R. REP. No. 100-711, at 24 (1988), as reprinted in 1988 U.S.C.C.A.N. 2173, 2185 ("While state and local government have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in the communities.  This has been accomplished by such means as the enactment or imposition of health, safety, or land-use requirements on congregate living arrangements among non-related persons with disabilities.  Since these requirements are not imposed on families and groups of similar size of together unrelated people, these requirements have the effect of discriminating against persons with disabilities. . . .  The [FHA] is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community."); see also H.R. REP. No. 100-711, at 31, as reprinted in 1988 U.S.C.C.A.N. 2173, 2192 ("A number of jurisdictions limit the number of occupants based on a minimum number of square feet in the unit or sleeping areas of the unit.  Reasonable limitations by government would be allowed to continue [pursuant to the FHA], *as long as they were applied to all occupants, and did not operate to discriminate on the basis of race, color, religion, sex, national origin, handicap or familial status*." (emphasis added)).

[6]  Application of these ordinances is likely to also violate the Equal Protection Clause of the Fourteenth Amendment.  See, e.g., City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985).

L.L.C. v. Zoning Bd. of Adjustment, 284 F.3d 442, 449, 456 (3d Cir. 2002).  A plaintiff

bringing a reasonable accommodation claim must first seek redress from the land

use authority before commencing suit.  Id. at 452 n.5.  The reviewing court is then

confined to the record made before the land use board, unless the plaintiff

establishes that the board prevented it from presenting sufficient information to

support a request for a reasonable accommodation.  Id. at 450-51.

The plaintiff bears the initial burden of demonstrating that the

accommodation requested from the land use board is necessary to afford a

handicapped individual an equal opportunity to use and enjoy a dwelling.  Lapid-

Laurel, 284 F.3d at 457.  The defendant must then prove that the requested

accommodation is "unreasonable," by showing that it could not have granted the

accomodation without:  (1) imposing undue financial and administrative burdens;

(2) imposing an undue hardship on the township; or (3) requiring a fundamental

alteration in the nature of the zoning program.  Id. at 457, 462; see also Hovsons,

Inc. v. Twp. of Brick, 89 F.3d 1096, 1104 (3d Cir. 1996).

In the case *sub judice*, the court finds that plaintiff has a substantial

likelihood of success on its reasonable accommodation claim.  The record before

the Zoning Board establishes that the prospective residents suffered from mental

illnesses, that they required around-the-clock staff to help them with their everyday

living, and that they had been clinically qualified for living at a LTSR.  See 55 PA.

CODE § 5320.31 ("To be eligible for admission to an LTSR, a prospective resident

shall . . . [e]vidence a severe psychological disability as a result of serious mental

illness that indicates a less restrictive level of care is inappropriate.").[7]  The DCU, convalescent home, and "health care treatment facility" classifications defendant relied upon to deny plaintiff's zoning application are not permitted as of right anywhere in the Township.[8]  Accordingly, a special exception or a variance is necessary to achieve an equal opportunity for the prospective residents to reside in *any* district in the Township.  Clearly, plaintiff's requests for a variance and special exception, or for its proposed use to be classified as a "family," were necessary. And the record before the Zoning Board is devoid of any evidence that the requests were unreasonable.

### B.   Irreparable and Comparable Injuries

At the July 20, 2006 hearing on the instant motion, the court heard credible and forthright testimony from Dr. Condron.  Dr. Condron testified, to a reasonable degree of medical certainty, that it is extremely urgent that the prospective

---

[7]  Although defendants contend that plaintiff failed to proffer objective evidence of the disabilities at the zoning hearing, as discussed, *supra*, federal and state laws prohibit the disclosure of such information—all the more so at a public hearing.  See 45 C.F.R. § 164.502; 55 PA. CODE § 5320.26.  And, it is evident from the record that defendants, at a minimum, regarded the prospective residents as disabled.  See 42 U.S.C. § 3602(h)(3) (defining "handicap" as "being regarded as having" a disability).  Finally, although defendants argue that the proposed residents could constitute a "danger" to the community, there is absolutely no evidence that these individuals are a risk to the safety of anyone.  Cf. Dadian v. Vill. of Wilmette, 269 F.3d 831, 840 (7th Cir. 2001) ("[T]he text and legislative history of the FHA support imposing the burden of proof on the public entity that asserts safety as a defense to a disability discrimination action.").

[8]  Indeed, the zoning ordinances do not even define the term "health care treatment facility."  (See Finding of Fact No. 99.)

residents be placed outside of the closed hospital, that their therapy is adversely affected each day that they are not in a least restrictive environment, and that their mental health would likely progress if they were placed at the Township Property. Dr. Condron's prehearing declaration also attests that the prospective residents' current living conditions are problematic, counter-productive and harmful to their mental health, and that for therapeutic reasons they should be moved to a LTSR as soon as possible.  In addition, Mr. Warren, the county administrator for the York/Adams Mental Health/Mental Retardation Program, testified that the budget for renovating and preparing the Township Property will expire in a matter of days,[9] and it is unclear whether additional funds will be appropriated.  Accordingly, the court finds that there is a risk of irreparable harm to the health and well-being of the proposed residents of the Township Property.

Defendants have not identified a specific harm that will arise if the injunction is granted.  Rather, defendants contend that the Township has, *sua sponte*, undertaken a "curative amendment" process to rectify the facially discriminatory DCU ordinance, purportedly negating any harm to plaintiffs.  The court is not persuaded.  The curative amendment process is a lengthy procedure, and its outcome is obviously uncertain.  See 53 PA. STAT. ANN. § 10609.1.  The court notes

---

[9]   But cf. Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (stating that "economic loss does not constitute irreparable harm"); Frank's GMC Truck Ctr., Inc. v. Gen. Motors, 847 F.2d 100, 102 n.3 (3d Cir. 1998) (stating that where money damages are available injunctive relief is inappropriate because "the applicant has an adequate remedy at law"); Liveware Publ'g Inc. v. Best Software Inc., 125 F. App'x 428, 433 (3d Cir. 2005) (same).

with interest that the document belatedly submitted by defendants as "proof" that the curative process is underway is, in fact, a *proposed* resolution to undertake an examination of the term "DCU" as defined in the Township Zoning Ordinances. (See Doc. 40, Attach. 2.)  The resolution is neither signed nor dated, and has not been adopted by the defendants.

Regardless of a possible "cure" contemplated by defendants, the risk of injury to the proposed residents is real and exigent, and weighs heavily in favor of granting the motion for preliminary injunctive relief.

## C.   Public Interest

There exists in this country a "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream."  Hovsons, Inc., 89 F.3d at 1105; see also 42 U.S.C. § 3601 (stating that the policy behind the FHA is to provide "fair housing throughout the United States"); cf. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600 (1999) ("[I]nstitutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life.").  Consistent with this national policy, the Commonwealth of Pennsylvania has expressly recognized the benefits of community-based treatment for its handicapped citizenry.  See, e.g.,

40

S. Res. 42, 169th Gen. Assem. (Pa. 1985);[10] cf. 55 PA. CODE §§ 5310.2, 5320.111.

Although it has long been recognized that local governments have a substantial interest in passing and enforcing ordinances to regulate land usage,[11] it is presupposed that such ordinances will be fashioned in a nondiscriminatory manner.  When they are not, federal and state interests transcend the deference normally afforded to local land use regulation.  Accordingly, the public interest in this case weighs in favor of granting the requested injunctive relief.

## III.  __Conclusion__

The facts of this case weigh overwhelmingly in favor of injunctive relief. Plaintiff has demonstrated a strong likelihood of success on the merits of its claims. It has shown the presence of irreparable harm to the mental health of the eight residents currently residing in the closed, state hospital.  In addition, the public interest is resoundingly in favor of granting the relief requested.  Accordingly,

---

[10]  This concurrent resolution, adopted in 1985, reaffirms Pennsylvania's policy that "people who are developmentally disabled, mentally retarded, mentally ill, physically disabled, [and] elderly . . . shall enjoy the benefits of community residential surroundings . . . [and] [t]hat all municipalities throughout [the] Commonwealth are urged to review their zoning ordinances to assure that they facilitate the achievement of this policy."  S. Res. 42, 169th Gen. Assem. (Pa. 1985).

[11]  See, e.g., Congregation of Kol Ami v. Abington Twp., 309 F.3d 120, 135-36 (3d Cir. 2002); see also Hovsons, Inc., 89 F.3d at 1106.

defendants will be enjoined from interfering with plaintiff's use of the Township

Property for the LTSR, as proposed in its zoning applications.[12]

The Fair Housing Act Amendments of 1988[13] represent one of many

legislative reforms designed to protect American citizens challenged by physical

and mental disabilities.[14]  It is time for Heidelberg Township to embrace these

reforms.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:       July 25, 2006

---

[12] Given the holding of this opinion, the court will not address the Zoning Board's peculiar position to abstain from these proceedings, or its last-minute entry into these proceedings.  Similarly, CSG's motion for "default" relief against the Zoning Board will be denied as moot.

[13] Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619.

[14] See, e.g., Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796l; Education of All Handicapped Children Act of 1975, Pub. L. 94-142, 89 Stat. 773; Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMUNITY SERVICES, INC.,** | : | **CIVIL ACTION NO. 1:06-CV-1206** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **HEIDELBURG TOWNSHIP, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 25th day of July, 2006, upon consideration of plaintiff's

motion for preliminary injunctive relief (Doc. 4), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.     The motion for preliminary injunctive relief (Doc. 4) is GRANTED conditioned upon the posting of a bond or appropriate security in the amount of $5,000.00 with the Clerk of Court.  <u>See</u> FED. R. CIV. P. 65(c).

2.     Defendants Heidelburg Township, Heidelberg Township Board of Supervisors, and Heidelberg Township Zoning Hearing Board are PRELIMINARILY ENJOINED from prohibiting plaintiff Community Services, Inc. From establishing and operating a long term structured residence at the property located at 1862 Smith Station Road, Spring Grove, Pennsylvania.

3.     Defendants Heidelburg Township, Heidelberg Township Board of Supervisors, and Heidelberg Township Zoning Hearing Board are directed to issue, or to direct the appropriate borough official to issue, within one (1) business day of the date of this order, the necessary use and occupancy permits for plaintiff Community Services, Inc., to utilize and operate the real property located at 1862 Smith Station Road, Spring Grove, Pennsylvania.

4.     The parties are directed to show cause, on or before September 29, 2006, why the court should not invoke the provisions of Rule 65(a)(2) and deem this an adjudication on the merits of the case.

5.   The motion (Doc. 29) to enter a preliminary injunction against the
     Heidelberg Township Zoning Hearing Board as uncontested is
     DENIED as moot.


                                   S/ Christopher C. Conner
                                  CHRISTOPHER C. CONNER
                                  United States District Judge